Filed 1/13/26  In re Jasmine H. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re Jasmine H. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E086836 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J294031-32) |
| v. | OPINION |
| R.H., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Emily Uhre, under appointment by the Court of Appeal, for Defendant and Appellant.

Laura Feingold, County Counsel and Helena C. Rho, Deputy County Counsel for Plaintiff and Respondent.

1

In this dependency proceeding, R.H. (Father) appeals from the termination of his parental rights to his two minor children. He argues that the juvenile court abused its discretion by failing to apply the beneficial parental relationship exception under Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i) (section 366.26(c)(1)(B)(i)) (unlabeled statutory references are to this code). We affirm.

BACKGROUND

Father and Y.L. (Mother) married in February 2020. They have two children together: Nathan H. (born in May 2019) and Jasmine H. (born in April 2020) (collectively, the children). Mother's two older teenage children from a different father—J.L. (female) and Vincent L.—lived with her and Father in July 2022. This appeal involves only Nathan, Jasmine, and Father; Mother and her two older children are not parties.

The family has a recent dependency history. In a dependency proceeding that was initiated in May 2020, Nathan and Jasmine were removed from the parents' custody. In June 2020, Jasmine and Nathan were placed with their maternal aunt, Valerie M., and her husband. The juvenile court sustained allegations of general neglect and emotional abuse as to both parents. Both parents received reunification services. In January 2022, Jasmine and Nathan were returned to the parents. The case was closed in mid-July 2022.

In July 2022, five days after the prior dependency case closed, the San Bernardino County Department of Children and Family Services (CFS) received a referral alleging emotional abuse of Vincent, who was then 16 years old, as the result of a domestic violence incident between the parents. Father had been drinking, slapped Mother, choked

2

her, and slammed her head against a wall. Vincent attempted to intervene to protect Mother, and Father threatened to hit Vincent. Jasmine and Nathan were at home but in a different room. Law enforcement arrested Father for spousal abuse.

A social worker investigated the referral and spoke with both parents. Father admitted that he had been drinking on the day of the domestic violence incident, but he could not remember what happened. He said that it was the first incident of domestic violence since CFS's involvement in the prior case.

In August 2022, CFS took the children into protective custody pursuant to a warrant. CFS temporarily placed Jasmine and Nathan with Valerie and her husband. CFS filed a petition under subdivisions (b)(1) and (j) of section 300, alleging that Jasmine and Nathan were at substantial risk of serious physical harm because of the parents' history of domestic violence, their dependency history, Father's alcohol abuse, and Father's criminal history.

The juvenile court detained the children in the home of the maternal aunt and uncle. The court ordered weekly, two-hour supervised visits for Father.

The court held a contested jurisdiction and disposition hearing in September 2022. In a report filed for the hearing, CFS reported that Nathan and Jasmine had adjusted well to the placement. The court sustained the allegations in the petition, removed Nathan and Jasmine from the parents' custody, declared Nathan and Jasmine dependents of the court, and ordered reunification services. The court ordered Father's supervised visits to continue as previously ordered and gave CFS authority to increase the frequency and duration of visits.

The court held a contested six-month status review hearing in April 2023 and a contested 12-month status review hearing in October 2023. At both hearings, the court ordered continued reunification services for Father. Throughout both review periods, the children remained placed with the maternal aunt and uncle and were doing well in the placement. CFS reported that the children were bonded with the maternal aunt and uncle and appeared comfortable with them. Both children went to the maternal aunt and uncle "freely and without hesitation." Father consistently attended once weekly two-hour supervised visits with the children at CFS's office. CFS and Valerie described Father as "engaging" and "appropriate" during those visits.

The court continued the 18-month status review hearing in order to allow Father to have unsupervised visits with the children during the day. CFS later reported that Father had successfully started visiting with the children unsupervised once per week for four hours. At the continued 18-month status review hearing in April 2024, the court terminated both parents' reunification services and found that it was not in the children's best interest to set a selection and implementation hearing under section 366.26. The court ordered discretionary services for Mother. The court also ordered the children to remain in out-of-home placement with the maternal aunt and uncle with a planned permanent living arrangement as the children's permanent plan.

In November 2024, the court held a six-month postpermanency review hearing. Jasmine and Nathan were still doing well in placement with the maternal aunt and uncle. Father consistently visited with the children once weekly for four hours at a park. Nathan

4

reported having fun during visits with Father. The court ordered that the children's permanent plan remain unchanged.

Several months later, CFS filed a petition under section 388 seeking to change the children's permanent plan to adoption. The court granted the petition and scheduled a selection and implementation hearing under section 366.26. The court granted Father's request to have a bonding study conducted.

A contested section 366.26 hearing was held in August 2025. The court admitted into evidence CFS's reports and a bonding study prepared by Robert E. Brodie II, Ph.D., a clinical psychologist. Brodie and both parents testified at the hearing.

The agency recommended that the court terminate Father's parental rights. The maternal aunt and uncle said they loved the children unconditionally and wanted to adopt them. The maternal aunt and uncle considered the children "'an extension of us, they are our family and our children.'" The couple explained that they were and always had been "'mom and dad to'" the children. The maternal aunt also reported that the children refer to her and her husband as "'"mom" and "dad" most of the time, sometimes after visits we are "aunt" and "uncle."'" Asked if they would allow the children to maintain a relationship with the parents, the maternal aunt and uncle responded: "'We don't want to keep them away, but we see the negative impact on the kids. We will put the kids first, but also want the kids to develop their own opinions.'"

The children were too young to express their desires, but a social worker saw them "seek out their caregivers for comfort when they [were] hungry, sleepy, or distressed,

with an obvious expectation their needs will be met." The social worker emphasized that the children remained "very comfortable and adjusted to the home environment."

In June 2025, Brodie conducted a bonding study concerning Father, Jasmine, and Nathan. Brodie interviewed Father and observed a three-hour visit at a park. Father told Brodie that his visits with the children were going great. They did "'a little bit of everything,'" such as going to the park and Chuck E. Cheese, and the children "'don't want to leave.'" Father expressed a desire to have custody of the children.

When Brodie arrived at the park, the children were already seated at a picnic table with Father. Father brought the children breakfast, snacks, and candy. Throughout the visit, "the children were energetic and happy, smiling and talkative."

Both children initiated physical contact with Father numerous times throughout the visit. While seated at the table, Nathan frequently ran to the other side of the table to interact with Father. Jasmine "put[] her hands around" Father, embraced him, and lay on him. She sought comfort from him "when she encountered bugs or something similar." When both children tired, they initiated physical contact with Father. Jasmine hugged Father and fell into his arms.

In the report, Brodie opined that both children had secure, substantial, and positive emotional attachments to Father and are bonded with him. Brodie extrapolated that in light of those attachments, it would benefit both children to have a continued relationship with Father. He also opined that "terminating the attachment would be detrimental to [the children] even when balanced against the countervailing benefit of a new adoptive home."

In his testimony at the hearing, Brodie opined that terminating the children's relationship with Father would be detrimental to both Jasmine and Nathan. Father and the children share a reciprocal, positive, and substantial emotional connection. Brodie explained that "the literature" shows that it is better for children to continue their relationship with a biological parent unless the parent is actively causing detriment to the children, which Father was not. Brodie noted that even though Jasmine and Nathan were young, they identified Father as their parent and a source of security and comfort. Losing that relationship and sense of security could cause the children to become depressed and feel abandoned.

Brodie noted that the children did not have any negative reaction when the visit ended, and they left with their caregivers without incident. The reason, in Brodie's opinion, was that the children had such a positive connection with Father and they felt comforted by Father's parting words that they would see him again.

Father testified that the children call him "'Daddy.'" He described his visits with the children, the places that he took them, and the activities that they engaged in. He said that he and the children were interested in the same music, and they would sing along with music he played during visits. Father said that "right before" visits would end the children would tell him that they wanted to spend more time with him and did not want the visit to end so soon.

The court found that Jasmine and Nathan were likely to be adopted. The court also found that Father had maintained regular visitation and contact and that there was evidence that the children had a substantial and positive relationship with Father. But the

court concluded that Father failed to prove that his relationship with the children was so beneficial that termination of parental rights would be detrimental to them. The court reasoned that at five and six years old Jasmine and Nathan had "spent the vast majority of their lives in the care of their relative caretaker, not in the care of either parent." The court found that "the benefits of stability and adoption outweigh any detriment the kids will suffer due to the termination of parental rights, because I do think they love their biological parents and I'm hopeful that they will remain in their lives, at least to some degree. [¶] But I think that the benefits of permanency and adoption for these five and six-year-old children with a relative taker that allows these two kids to remain together outweighs any detriment they may suffer." The court accordingly terminated Father's parental rights.

DISCUSSION

Father argues that the juvenile court erred by failing to apply the beneficial parental relationship exception under section 366.26(c)(1)(B)(i). We are not persuaded.

At the section 366.26 hearing, if the juvenile court finds that a dependent child is likely to be adopted, then the court must terminate parental rights and select adoption as the permanent plan unless it finds that adoption would be detrimental to the child under one of several exceptions. (§ 366.26, subd. (c)(1); *In re Caden C.* (2021) 11 Cal.5th 614, 630-631 (*Caden C.*).) The "'exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*Caden C.*, at p. 631, quoting *In re Celine R.* (2003) 31 Cal.4th 45, 53.)

Under the beneficial parental relationship exception, the parent bears the burden of proving three elements by a preponderance of the evidence. (*Caden C.*, *supra*, 11 Cal.5th at p. 636; § 366.26(c)(1)(B)(i).) First, the parent must show regular visitation and contact with the child. (*Caden C.*, at p. 636.) Second, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Ibid.*) Third, the parent must show that the termination of parental rights "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Ibid.*)

Overall, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*); *Caden C.*, *supra*, 11 Cal.5th at p. 633.)

When "assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 632, citing *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) The parent must show that their relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with

9

new, adoptive parents." (*Autumn H.*, at p. 575.) "A showing the child derives some benefit from the relationship is not a sufficient ground to depart from the statutory preference for adoption." (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646, disapproved on other grounds in *Caden C.*, at pp. 637, 638, fns. 6, 7.) The court may consider issues ranging from "the specific features of the child's relationship with the parent and the harm that would come from losing those specific features to a higher-level conclusion of how harmful in total that loss would be." (*Caden C.* at p. 640.) The court must also assess "how a prospective adoptive placement may offset and even counterbalance those harms," and in that regard the court may consider "findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told." (*Ibid.*) "'Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship.'" (*Id.* at p. 633.) A court therefore cannot rely on the expectation of continued contact between the children and the parents after adoption in analyzing whether termination of parental rights would be detrimental to the children. (*In re M.V.* (2023) 87 Cal.App.5th 1155, 1186 (*M.V.*).)

We review for abuse of discretion the juvenile court's determination that any detriment caused by the termination of parental rights would not outweigh the benefits of adoption. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) But we review any factual findings underlying that determination for substantial evidence. (*Ibid.*)

The juvenile court found that Father maintained regular visitation and contact with the children and that the children had a substantial, positive emotional attachment to him.

10

The only issue on appeal concerns the third element, namely, whether any detriment that might be caused by severing the parental relationship outweighs the benefits of adoption. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

The juvenile court did not abuse its discretion by determining that loss of any benefits derived from the children's relationship with Father did not outweigh the benefit that children would gain through adoption. By the time of the section 366.26 hearing, Jasmine and Nathan were five and six years old. They had spent the majority of their lives out of Father's care and instead lived with the maternal aunt and uncle during that period. Jasmine was only one month old and Nathan had just turned one year old when they were initially placed with the maternal aunt and uncle, with whom they stayed for one and one-half years before the parents took custody of them for seven months. The children were only two and three years old when they were again detained and placed with the maternal aunt and uncle, where they remained throughout the following three years of this dependency proceeding. The maternal aunt and uncle loved Jasmine and Nathan, and both children were bonded and comfortable with the caregivers. The children were doing well and thriving in the home of the maternal aunt and uncle, whom they primarily referred to as "'mom and dad.'"

The record reflects that the children enjoyed visiting with Father and loved him. But "[a] parent must show more than frequent and loving contact or pleasant visits." (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.) Although Brodie opined that the children have a strong, positive connection with Father, there was no evidence that the relationship was so strong as to outweigh the security and stability that the particular

11

adoptive home would confer.  (Cf. *Caden C.*, *supra*, 11 Cal.5th at pp. 633-634 ["When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent"].)  The juvenile court was not required to credit Brodie's contrary opinion, and there was no other evidence that "terminating that attachment would be detrimental to [the children] even when balanced against the countervailing benefit of a new adoptive home."

For example, there was no evidence that the children were sad at the ends of visits, including the one that Brodie observed.  There also was no evidence that the children wanted to see Father more frequently than once per week or that their behavior or general well-being was otherwise negatively affected by not spending more time with Father.  (Cf. *Caden C.*, *supra*, 11 Cal.5th at p. 633.)  Father said that the children would express to him that they did not want visits to end, but Brodie did not observe any such behavior.  The juvenile court was free to disbelieve Father's uncorroborated account.  (*In re E.E.* (2020) 49 Cal.App.5th 195, 214.)  And in any event, Father's claim that the children did not want visits to end shows only that the children loved Father and enjoyed his visits.  It does not show that the relationship with the children was so strong that the harm of severing it would outweigh the benefit of the adoptive home.

Father's arguments to the contrary are not persuasive.  He first argues that in determining that the stability and security of adoption outweighed any detriment the children might experience from severing the relationship with Father, the juvenile court erred by not expressly addressing Brodie's expert opinion.  The argument fails, because

the juvenile court was not required to expressly assess any particular items of evidence when determining that the beneficial parental relationship exception did not apply. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156, 1161.)

Relying on *M.V.*, Father next argues that the juvenile court erred by "impermissibly speculat[ing] as to post-adoption contact Father may have with the children" in deciding the third *Caden C.* element. The argument fails because the record does not support it. In analyzing whether the benefits of the security and stability of a new home would be outweighed by the loss of the relationship with Father, the juvenile court did state that it was "hopeful" that the children would continue a relationship with Father after parental rights were terminated. But there is no indication that the court considered or weighed that factor in analyzing the issue. Rather, the court properly weighed the benefits of stability provided by the adoptive home in which the children had spent "the vast majority of their lives" against the loss of the positive relationship that they had with Father. The court's expression of hope that the relationship would continue did not indicate that the court relied on the prospect of such a continued relationship in determining that termination of parental rights would not, on balance, be detrimental.

*M.V.* does not assist Father. There, the juvenile court did not merely express a hope that the children would continue a relationship with the parent. Rather, the juvenile court stated that its analysis was based in part on "'trust[ing] that the grandparents are acting in the best interest of their child'" by recognizing that the adopted children would seek to develop a relationship with their parents. (*M.V.*, *supra*, 87 Cal.App.5th at

p. 1185.)  In contrast, the juvenile court here did not say that it expected that the maternal aunt and uncle would allow the children to continue their relationship with Father.

For all of these reasons, we conclude that the juvenile court did not abuse its discretion by concluding that the benefit the children would receive from adoption was not outweighed by any detriment they might suffer from the termination of Father's parental rights.

## DISPOSITION

The orders terminating Father's parental rights to Nathan and Jasmine are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

CODRINGTON
Acting P. J.

RAPHAEL
J.

14